Roscoe L. JONES et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, a municipal corporation, Defendant.

The ELLEN REAL ESTATE CORPORATION et al., Plaintiffs,

v.

The DISTRICT OF COLUMBIA et al., Defendants.

Civ. A. Nos. 3169–61, 3318–61.

United States District Court District of Columbia.

Dec. 20, 1962.

Friedlander & Friedlander, Mark P. Friedlander, Mark P. Friedlander, Jr., Blaine P. Friedlander, Washington, D. C., for plaintiffs Roscoe L. Jones and others.

Jackson, Gray & Laskey, Thomas S. Jackson, Darryl L. Wyland, Austin P.

Frum, Washington, D. C., for plaintiff Ellen Real Estate Corp. and others.

Chester H. Gray, Corp. Counsel, John A. Earnest, George H. Clark, and James M. Cashman, Asst. Corp. Counsel, Washington, D. C., for District of Columbia.

KEECH, District Judge.

These actions against the District of Columbia and the Commissioners thereof were originally brought by certain named owners and operators of rooming houses in the District of Columbia. Subsequently the cases were enlarged into class actions on behalf of rooming house, apartment house, and tenement owners and operators similarly situated, and were consolidated for trial. The actions challenge the validity of Articles 8 through 8–I of the 1961 District of Columbia Building Code, which are fire regulations promulgated by the Commissioners applicable to buildings existing on the effective date of the 1961 Building Code.

In their complaints, plaintiffs asserted that their premises have been used as rooming houses, apartment houses, or tenements by the plaintiffs themselves, or by prior owners with whom they are in privity, for many years, in most cases more than twenty years; that in many instances the properties were purchased upon a valid belief that the business of a rooming house, apartment house, or tenement could be operated therein, and the plaintiffs and their predecessors in title have paid for their properties at values reflecting those circumstances; that plaintiffs have, through the purchases aforesaid, and through their industry and development of their businesses, obtained a property right, not only in the property itself, but in the rooming house or other business operated on the premises; that all of the plaintiffs were, prior to the acts of the defendants here complained of, the owners and holders of occupancy permits and rooming house or other business licenses.

At the pretrial hearing, the following facts were stipulated: On December 31, 1960, each of the plaintiffs held some sort of an occupancy permit for a rooming house, apartment house, or tenement house. On September 29, 1960, the Commissioners adopted the 1961 Building Code, which became effective January 1, 1961. After January 1, 1961, certain of the plaintiffs received from the Department of Licenses and Inspections of the District of Columbia a form notice that the occupancy permits held by them were "no longer valid" and that if they desired to continue to carry on in the premises the businesses theretofore authorized to be conducted, it would be necessary for them to secure a new certificate of occupancy valid under the 1961 Building Code. Thereafter certain of the plaintiffs applied for new occupancy permits. They were subsequently advised by a written communication from the Chief of the Zoning Occupancy Inspection Branch of the D. C. Department of Licenses and Inspections that inspection of their premises had disclosed certain deficiencies existed which must be remedied before issuance of a new certificate would be granted. Enclosed was a form specifying the particular provisions of the 1961 Building Code of which they were alleged to be in violation.

The plaintiffs in C.A. 3169–61, Roscoe Jones, et al., did not apply for new occupancy permits, and were prosecuted by the District of Columbia in the Municipal Court for the District of Columbia (Mun.Ct.No. DC 27151–61, et seq.) for operation of a rooming house without a certificate of occupancy. On November 20, 1961, a motion for judgment of acquittal was granted in each case.

Plaintiffs ask judgment declaring invalid Articles 8 through 8–I of the 1961 Building Code, enjoining prosecution of the plaintiffs for failure to comply therewith, or penalizing of plaintiffs otherwise, and declaring the notices directing compliance with said regulations to be inadequate and insufficient to apprise plaintiffs of what is required of them and of such vagueness and ambiguity as to lack due process and to deny equal protection of the law.

The cases came on for hearing on the merits, at which time plaintiffs presented

a number of witnesses and certain documentary evidence. At the conclusion of plaintiffs' cases, counsel for the Commissioners moved for a finding in their favor and dismissal of the actions on the ground that, under the law and upon the evidence adduced, plaintiffs had failed to make out a case.

I

Plaintiffs contend that Articles 8 through 8–I of the 1961 Building Code are invalid on the following grounds: (1) no authority exists in the Commissioners to adopt regulations applicable to existing buildings, except such authority as may be found in the so-called Means of Egress for Buildings Act of December 24, 1942 (D.C.Code § 5–317 et seq.; 56 Stat. 1083, ch. 818), and such Act is not broad enough to authorize the regulations here in issue; (2) the regulations are ambiguous, uncertain, indefinite, and in language not understandable by persons of common intelligence and from which such persons cannot deduce what is required of them, and therefore the regulations are unenforceable; and (3) no public hearing of the type and character required by Section 5–317, D.C.Code (56 Stat. 1083, ch. 818, § 1) was held.

The Commissioners, on the other hand, contend that the Congress, by Sections 1–226, 1–228, and 5–317, D.C.Code, has vested them with authority to promulgate the challenged regulations; that the regulations are not ambiguous, uncertain, or indefinite; that, even if a rooming house operator may accurately claim (which the Commissioners do not concede) that he cannot understand them, this does not invalidate the regulations; that they are so written that they may be read and understood by an engineer, architect, or artisan with experience in the field of building and fire safety, and that this is the proper criterion for determining whether the regulations are valid in this respect; and that a public hearing was held, of the type and character required, prior to adoption of the challenged regulations.

The court has for determination, first, whether the Commissioners had authority to promulgate regulations of the type here in issue, which are in terms applicable to existing buildings and are therefore retroactive in effect.

Preliminary to considering the specific statutory authority claimed by the Commissioners, it should be noted that the Congress has exclusive legislative jurisdiction over the District of Columbia, and that the Commissioners, being mere agents of the Congress, have only such authority to promulgate regulations as the Congress has specifically vested in them in any given field. Patrick v. Smith, 60 App.D.C. 6, 45 F.2d 924 (1930), and cases there cited at 45 F.2d 926.

The Commissioners rely first on Section 1–226, D.C.Code (Feb. 26, 1892, 27 Stat. 394, Res. No. 4, § 2), as authorizing the regulations in question. That section merely authorizes the promulgation of reasonable and usual police regulations. It is the opinion of this court that the fire regulations in question are not "reasonable and usual" police regulations, especially since they are retroactive in their application to existing buildings.

The second statutory authority relied upon by the defendants is Section 1–228, D.C.Code (June 14, 1878, 20 Stat. 131, ch. 194, § 1 in part, § 2), which vests the Commissioners with authority to promulgate building regulations which they deem advisable. This section does not in terms authorize retroactive regulations, and there is no legislative history indicating such intent on the part of the Congress. On the contrary, it would appear that the Congress intended the building regulations to be prospective, rather than retroactive. The authority to make building regulations was attached to legislation relating to the sale of coal in the District of Columbia. Certainly, in dealing with the sale of coal, the Congress was looking to prospective acts. The fact that the authority for promulgating building regulations appears immediately in the wake of such provision, not even as a separate paragraph or sentence, indicates that a similar intent ex-

isted as to the building regulations authorized, if any inference is to be had.

It is true that certain jurisdictions have held that building regulations may be retroactive in the absence of specific authority to make them so. In each such instance, however, the act was that of a true legislative body, as distinguished from a body such as the Commissioners, who are mere agents of the legislature.

Further, as was well said in the case of City of Seattle v. Hinckley, 40 Wash. 468, 82 P. 747 at page 748, 2 L.R.A.,N.S., 398 (1905):

"* * * It may be conceded that the fundamental rule of construction of statutes is that they should not be construed to be retrospective unless the retrospective intention is expressed or can be plainly gathered from the provisions of the act. * * *"

No such intent on the part of the Congress can be gathered from either Section 1–226 or Section 1–228.

Congress has been jealous of its legislative authority and has retained such authority except where expressly vested in the Commissioners. The courts, recognizing this, have uniformly held authority to exist in the Commissioners only where specifically delegated by the Congress, and delegation to the Commissioners of authority to regulate will not be implied in an area where Congress itself has acted.

In the case of Coughlin v. District of Columbia, 25 App.D.C. 251 (1905), there was challenged the validity of snow removal regulations promulgated by the Commissioners in reliance upon Section 1–226, D.C.Code, supra. The Congress had previously enacted legislation specifically relating to that subject, which had been held invalid. At page 257, our Court of Appeals stated:

"These repeated attempts at legislation, however ineffectual in their result, are sufficient to show that Congress reserved this subject [snow removal] for itself, and did not confer upon the commissioners the power to regulate it."

For all the foregoing reasons, the court holds that the Congress by enactment of Sections 1–226 and 1–228, supra, did not intend to, and did not in fact, vest the Commissioners with authority to promulgate fire safety regulations of the type here in issue.

This brings the court to the third statute on which the Commissioners rely for authority to promulgate the challenged regulations, namely, Section 5–317, D.C.Code (Dec. 24, 1942, 56 Stat. 1083, ch. 818, § 1). That section specifically provides:

"The Commissioners of the District of Columbia, for protection against fire, are hereby authorized, after public hearing, to promulgate regulations to require the owner entitled to the beneficial use, rental, or control of any building *now existing* or hereafter erected, other than a private dwelling, which is three or more stories or over thirty feet in height, or is used as a hospital, school, asylum, sanitarium, convalescent home, or for similar use, or as a place of amusement, public assembly, restaurant, or for similar use, to provide, install and maintain sufficient and suitable means of egress, guide signs, guide lights, exit lights, hall and stairway lights, standpipes, fire extinguishers, alarm gongs and striking stations, and such other appliances as the Commissioners may deem necessary for such buildings." (Emphasis supplied.)

The clear language of the statute permits no challenge of the fact that the Congress intended to and did thereby authorize the Commissioners "for protection against fire" to promulgate regulations applicable to any building, including "any building now existing" as well as those thereafter erected, which was of the dimensions or of one of the uses described.

The next question raised is what the Congress intended to be the scope of the regulations. Plaintiffs contend that the Act deals only with outside exits and certain specific enumerated appliances.

On the other hand, the Commissioners contend that the Act deals not only with outside exits, but also with ways and means of reaching such outside exits, including necessarily hallways and stairways, entrances to rooms, transoms, and the like.

■ In attempting to ascertain the intent of the Congress as to the scope of the regulations authorized by Section 5–317, the court must act on the premise that legislation looking to protection of human life against fire is to be construed so as to achieve its purpose. It is elementary that a statute is to be read in the light of the problems it was designed to resolve, and the court must find every intendment in favor of the validity of the act and necessary to its purpose.

Reason dictates that persons on the second and third floors of buildings are to be protected from fire as well as those on the first floor, and similarly that those in the middle or at either end of a corridor or hallway on any floor are equally entitled to sufficient and suitable means of protection.

When read in its entirety, Section 5–317 is a broad authorization. The statute in terms authorizes, among other things, regulations requiring property owners of the buildings described to provide, install, and maintain sufficient and suitable means of egress. "Sufficient and suitable means of egress", if limited to mere outside exits without requiring a reasonably safe passage thereto, would be meaningless as to those persons not having direct and immediate access to such exits, rendering them forgotten and lost men and women. That it was the intent of Congress to provide protection for those not immediately adjacent to outside exits is demonstrated by inclusion of authority to require by regulation "guide signs, guide lights, exit lights, hall and stairway lights, * * * alarm gongs, * * and such other appliances as the Commissioners may deem necessary for such buildings." The latter language clearly contemplates the need for safe passage through the halls and stairways and other parts of the buildings to the outside exits.

The court therefore concludes that the Congress not only specifically vested the Commissioners with the authority to promulgate regulations requiring outside exits but also, by the use of the language "sufficient and suitable means of egress", clearly intended that the Commissioners promulgate such regulations as would permit a reasonably safe passage and outlets from all inhabited areas of the building to such outside exits, as well as "such other appliances as the Commissioners may deem necessary", including but not limited to certain specifically enumerated items of interior equipment. Likewise, there can be no valid challenge of the power of Congress to authorize fire safety regulations, even though retroactive in their application, such authorization being clearly a proper function of a duly constituted legislative body.

■ Having so concluded, the next question is whether the regulations promulgated were reasonable and necessary to carry out the above-stated intent of the Congress. The record shows no real challenge on this score. Further, there is a strong presumption of validity, and the burden of showing a regulation to be unreasonable and oppressive rests upon the party attacking it. Zahn v. Board of Public Works, 274 U.S. 325, 47 S.Ct. 594, 71 L.Ed. 1074 (1927); Marblehead Land Co. v. City of Los Angeles, 47 F.2d 528, 532 (9th Cir., 1931); Sinclair Refining Co. v. City of Chicago, 178 F.2d 214, 217 (7th Cir., 1949).

■ Plaintiffs complain that some of the provisions of the 1961 Building Code impose so onerous a burden on them as to amount to a confiscation of plaintiffs' properties, since the cost of compliance would far exceed what would be reasonable under the circumstances. It has been held that there is no reason to set aside an act of the legislature, when the subject lies within the police powers of the state, merely because compliance is burdensome. In addition, under Article 8, Section 3–6229, of the 1961 Building

Code, if compliance with any of the provisions of Articles 8 through 8–I be deemed by an owner to be unduly burdensome, he may apply to the Board of Appeals and Review for the granting of a variance.

■ There remain the questions whether the regulations are unenforceable for uncertainty and ambiguity, and whether they are void on the ground there was no compliance with the hearing provision of Section 5–317 before their adoption by the Commissioners.

Plaintiffs placed upon the stand a number of witnesses, mostly owners and/or operators of rooming houses, of varying degrees of intelligence and education. Among these was a builder who was also the operator of a number of rooming houses. This witness testified that his construction work related to new structures and the restoration of old ones, and he frankly stated that he had little or no experience in the field of altering or repairing buildings. In addition, he testified that all his work was performed pursuant to an architect's plans and specifications. Two lawyers took the stand. One, an owner of rooming houses, indicated difficulty in understanding the regulations and/or notice pursuant thereto but did not state firmly his inability to do so. The other, who stated he had been called upon to draft a contract for work to be done in compliance with the regulations, indicated difficulty but testified that he was able to draft such a contract for his client, a contractor. There was testimony from some of the rooming-house operators to the effect that in certain instances they had been unable to get a firm contract for the work required under the notice from the District of Columbia pursuant to the regulations; but this fact, without more, is of little probative value. The contractors referred to did not testify; and a variety of reasons could have motivated their lack of desire to enter into a contract for the work in question or with the parties involved.

In addition to the uniformity of view expressed by plaintiffs' witnesses that difficulty was experienced in understanding the regulations and/or notices issued pursuant thereto, there was a clear undertone of an absence of desire to conform, based on economic reasons. It is significant to note that some of the rooming house operators called to the stand were the owners or operators of a number of large and valuable pieces of realty. Where the safety of the public is at stake and the requirement is reasonably necessary thereto, the financial status of an operator, be he large or small, is of course not controlling.

In sum, the court must find that the consensus of the opinions expressed by plaintiffs' witnesses was that they had experienced difficulty in understanding what was required by the regulations and/or notices, some concluding that, with effort, determination could be made as to what was required, others not understanding them after study, still others not very diligently trying to understand, and some, apparently, not exploring the matter for economic reasons. Some were unable to obtain firm contracts for the work required under the regulations, and others were able to do so.

In making a finding on the question of ambiguity, uncertainty, and indefiniteness, it is necessary first to ascertain the proper criterion. Is the test to be whether the regulation can be understood by (a) a person of common intelligence and training, that is, an ordinary person without any real knowledge in the field in question, or (b) a person with some knowledge in the field, such as an engineer, architect, or artisan? To put it another way, when the field is one involving technical knowledge, would mere complexity of language or words of art used in the regulation render it ambiguous and indefinite?

It would seem that a statute which contemplates promulgation of regulations for protection against fire, and incident thereto requires an owner to provide, install, and maintain sufficient and suitable means of egress, as well as enumerated specific safety appliances and "such other appliances as the Commissioners deem necessary", would necessarily require the employment in the regulations of some

technical language (as would, also, plumbing, electric, and similar codes). Technical language being intrinsically necessary in the regulations in order to carry out the legislative purpose, it follows that the proper test of clarity must be whether the regulation can reasonably be understood by a person with knowledge in the field.

Using that criterion, the court finds that the plaintiffs have failed to show that the regulations here in issue are ambiguous or indefinite.

Counsel for plaintiffs have conceded that if authority exists in Section 5–317, D.C.Code, for the basic requirements of the regulations, they may not be successfully challenged merely because they are implemented by reference to sections of the Building Regulations authorized by other Acts of Congress.

■ Finally, plaintiffs contend that the regulations are void because of failure of the Commissioners to hold an appropriate public hearing as required by Section 5–317. It appears that while plaintiffs do not envision that Congress intended a judicial hearing or an adversary proceeding, they do conclude that the public hearing record must contain facts warranting the promulgation of the regulations. In short, they conclude that, absent facts gleaned at the public hearing sufficient to support the regulations promulgated, they are void. With this contention the court does not concur. It is the court's view that the statutory requirement for a public hearing is satisfied by the giving of adequate notice of the hearing to be held, including the subject matter, general purpose, time and place thereof, and affording to those interested an opportunity to express their views. Such a hearing was in fact held. It was similar in character and purpose to a hearing held by a Congressional committee. The fact that findings cannot be made from the transcript to support each regulation adopted after the hearing, is of no consequence. The court concludes that a public hearing such as was intended by the Congress in enacting Section 5–317 was held.

## II

■ As to the alleged revocation of plaintiffs' certificates of occupancy, they contend: (1) no statutory authority existed for issuance of "temporary" certificates of occupancy or for "temporary" regulations in relation thereto; (2) no statutory authority exists for defendants' revocation of such certificates of occupancy without a hearing and without an appeal; (3) no statutory authority exists permitting defendants to condition issuance of new certificates of occupancy upon compliance with retroactive provisions of the 1961 Building Code; and (4) the notices sent pursuant to the 1961 Building Code were ineffective because they were retroactive, uncertain, vague, ambiguous, and not understandable by persons of ordinary intelligence.

The printed occupancy permit form bore the following:

"This Certificate of Occupancy need not be renewed unless there is a change in (1) the type of business, (2) address of business, (3) ownership of business, or (4) part of the building used for the business; *BUT*, should there be any change in one or more of the foregoing items a *NEW* Certificate of Occupancy must be obtained."

The record shows, however, that for a substantial period of time from May 28, 1943 (subsequent to enactment of § 5–317, D.C.Code), it was the practice of the Commissioners to issue the occupancy permits with the following additional notation stamped thereon:

"Approved under temporary regulations governing rooming and/or lodging houses.

"This building will be subject to permanent building regulations upon termination of the emergency referred to by the Commissioners, D. C., in their order of May 28, 1943." (C.O. 422,959)

During this period, certain occupancy permits, through clerical error or inadvertence, were issued without such notation. The omission was contrary to the

Commissioners' general practice, unintentional, and resulted from an administrative mistake.

No mistake of a District employee can relieve the recipient thereof from compliance with valid regulations adopted by the Commissioners for protection of the public. To hold otherwise, would be to sanction discrimination among persons equally subject to the same regulation. The court therefore concludes that all holders of occupancy permits issued during the period in question, whether they bore the "temporary" notation or whether such notation was inadvertently omitted, stood in the same position and held occupancy permits of like duration.

The Commissioners' order of May 28, 1943, provided, in the second paragraph thereof:

> "During the period of this emergency and not to exceed six months thereafter the following modifications of the D. C. Building Code shall be applicable to existing buildings only: * * *."

The modifications referred to lessened the requirements to be met for issuance of an occupancy permit. It will be immediately observed that the enactment date of Section 5-317 (December 24, 1942) was during the period of the Second World War, when materials were difficult to obtain and when there was a tremendous influx of people into the District of Columbia in connection with the war effort, resulting in an acute housing shortage. The demand for rented rooms continued after World War II, through the Korean difficulty and into the so-called "cold war".

The modifications referred to in the Commissioners' war-time order were born of necessity and permitted the use of premises for the period of the emergency therein specified under less stringent requirements as to safety than do the permanent regulations. The Court holds this was a reasonable exercise of the Commissioners' regulatory authority, balancing the urgent temporary need for housing against the desirability of immediate strict application of the fire regulations authorized by Section 5-317 to all subject structures.

The plaintiffs recognize the right of the Commissioners to require certificates of occupancy on property to be used for business purposes in the District of Columbia, and to require the property to be in suitable physical condition for the purpose for which it is to be used. The plaintiffs contend, however, that the certificates of occupancy issued to them, notwithstanding the notation thereon that they were temporary in character, were not properly revoked by the Commissioners.

The notation stamped on the face of the occupancy permits plainly declared the issued permit to be temporary in character and effective only until adoption of permanent building regulations upon termination of the emergency. It would therefore follow that when the period of emergency and the six-month period of grace thereafter had in fact elapsed, the occupancy permits would be ineffective, persons holding the temporary permits would be without any occupancy permit, and a new application and compliance with the permanent building regulations would be conditions precedent to issuance of a new permit.[1]

The Commissioners' notices to holders of occupancy permits in the cases at bar therefore constituted not notices of revocation, but notices of expiration of the

---

1. 1961 D.C. Building Code, Art. 11, § 3-162:

"*General Requirements.* No person shall use any building, land, or premises, or part thereof, for any purpose, except as hereafter exempted, until the Director of Licenses and Inspections, upon written application, shall have issued a Certificate of Occupancy to such person for such use, provided the use complies with the Zoning Regulations and the building, land, or premises or part thereof so used complies with all *applicable* requirements of this Code, the related Mechanical and Electrical Codes, the Housing Regulations, and all orders promulgated by the Commissioners pertaining to any such Codes. (C.O. 61-297)"

occupancy permits theretofore issued, whether their effective period be deemed to have been terminated by the passage of time, by adoption of the 1961 Building Code, or by the Commissioners' notice itself.

It is difficult to see how the plaintiffs, by reason of the Commissioners' gratuitous extension of the time within which they could operate under their temporary permits (past the six-month grace period and until the effective date of the 1961 Building Code), can contend that these patently temporary occupancy permits have been converted into permits of indefinite duration, subject to renewal only if and when one or more of the contingencies specified in the printed form occurred.

It is the opinion of the court that the rooming house operator had only a temporary occupancy permit and that the mere passing of the emergency and grace period, plus any extension thereof, did not convert the temporary permit into an occupancy permit which would endure for an indefinite period, subject only to specific changes in the nature of the occupancy. The court holds that this applies not only to the permits which contained the "temporary" stamp, but also to those which through clerical mistake were inadvertently issued without such stamp.

Apart from the temporary nature of the occupancy permits held by the plaintiffs, promulgation of regulations by the Commissioners, in exercise of the authority delegated to them by the Congress to adopt reasonable fire protection regulations applicable to existing properties, might well effect a termination of theretofore valid occupancy permits. As stated in Hadacheck v. Los Angeles, 239 U.S. 394, at page 410, 36 S.Ct. 143, at page 145, 60 L.Ed. 348 (1915), referring to the police power of a state:

"* * * It is to be remembered that we are dealing with one of the most essential powers of government, one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining. Chicago & Alton R.R. v. Tranbarger, 238 U.S. 67, 78 [35 S.Ct. 678, 59 L.Ed. 204]. To so hold would preclude development and fix a city forever in its primitive conditions. There must be progress, and if in its march private interests are in the way they must yield to the good of the community. * * *"

One of the occupancy permits in the Jones case (issued to Blumar Jones on January 1, 1949) was on an apparently earlier permit form, and bore neither the printed notation as to the duration thereof nor the stamped "temporary" notice. The issuance of this occupancy permit to Blumar Jones in 1949 did not vest in him such an interest as would prevent the Commissioners' exercise in 1961 of their valid authority to promulgate reasonable fire protection regulations applicable to his existing business premises.

See Taylor v. District of Columbia, 24 App.D.C. 392, 401 (1904), where it was held that no alleged prescriptive right could prevent Congress from conferring upon the Commissioners authority to make reasonable police regulations for the market place, even though such regulations had the effect of divesting farmers, gardeners, and hucksters of the right to use certain market spaces continuously occupied by them for a period of from twenty-five to thirty years.

As stated above, upon expiration of their occupancy permits, it became the duty of the plaintiffs to obtain new permits.[2] The complainants Jones must

---

2. D.C. Building Code, 1961, § 3–166: "*Application for Certificate of Occupancy.*
"It shall be the responsibility of the owner, tenant, or authorized agent to file an application in all cases where a certificate of occupancy is required * * *."

charge themselves, rather than the Commissioners, with failure to act.

Assuming, but not conceding, that the occupancy permits held by plaintiffs did not expire automatically under their terms, or by adoption of the 1961 Building Code, or by reason of the Commissioners' notices of expiration, then the Commissioners had the right, indeed duty, to revoke the existing permits if the actual occupancy did not conform to the building regulations relating to rooming houses,[3] and the notices sent to the plaintiffs may be deemed notices of revocation.

Plaintiffs' contention that there was no statutory authority for conditioning the notices upon compliance with retroactive provisions of the Building Code has been disposed of by the court's ruling as to the retroactive application of Section 5–317, D.C.Code, supra.

It is argued by the plaintiffs that the notices were vague, uncertain, ambiguous, and could not reasonably be understood by persons of ordinary intelligence. Applying the same criteria as to clarity, certainty, and ability to be understood that were applied to the challenged regulations, the court finds that the notices were not ineffective because of vagueness, uncertainty, ambiguity, or inability

to be understood, and further that they were not void because of reference to provisions of the Building Code other than those promulgated under authority of Section 5–317, D.C.Code, supra.

The record showed that the plaintiffs in the two consolidated actions followed different courses of action following receipt of notice of termination of their occupancy permits. Plaintiffs in the Ellen Realty case (C.A. 3318–61) applied for a new permit and received notices informing them that issuance of the new permit requested would be conditioned upon their compliance with certain designated provisions of the Building Code. Plaintiffs in the Jones case (C.A. 3169–61) made no application for a new occupancy permit, and risked criminal prosecution for operating without a valid occupancy permit.

In neither instance did the plaintiffs avail themselves of their administrative remedies, namely, the right to appeal to the Board of Appeals and Review [4] or the right to apply for the granting of a variance on the ground of undue hardship.[5]

### III

We come then to the argument of plaintiffs Jones (C.A. 3169–61) that the judgments of acquittal in the Municipal

---

3. D.C. Building Code, 1961, Art. 11, § 3–167: *"Revocation and Recall of Certificates.* Certificates of occupancy shall be revoked if the actual occupancy does not conform with that permitted * * *."

4. 1961 D.C. Building Code, Chapter 1, Art. 13, Sec. 3–177: *"Board of Appeals and Review.* This Board provides machinery for appeals from various decisions for any person aggrieved by any action, decision or ruling relating to Article 8 through 8 I of the Building Code. See § 3–6229 of Chapter 6. For further details see Organization Order No. 112, as amended."

5. 1961 D.C. Building Code, Chapter 6, Art. 8, § 3–6229. *"Board of Appeals and Review.* In applying the provisions of Articles 8 through 8 I and related structural requirements, the Board of Appeals and Review may grant a variance from the application of Articles 8 through 8 I, if

such Board shall find that the full performance of the requirements of Articles 8 through 8 I and related structural requirements would result in undue hardship by reason of excessive structural or mechanical difficulty or impracticability of bringing the premises affected into full compliance with the requirements of Articles 8 through 8 I; provided, that a variance will be granted only where, and to the extent, necessary to ameliorate such exceptional and undue hardship and only when the compensating factors are present which give adequate protection to the public safety; or which will be provided and installed and which give adequate protection to the public safety; and such variance can be granted without impairing the intent and purposes of Articles 8 through 8 I. Any decision of the Board of Appeals and Review made pursuant to this Section shall be final."

Court constitute *res judicata* as to the issues here raised.

■ It has been held repeatedly that, though a civil action by the United States is bottomed on the same facts, it is not barred by a judgment of acquittal in a prior federal criminal prosecution. United States v. National Assoc. of Real Estate Boards, 339 U.S. 485, 493–494, 70 S.Ct. 711, 94 L.Ed. 1007 (1950), which affirmed in part and reversed in part 84 F.Supp. 802 (D.C.Cir.1949), and cases there cited. The difference in the degree of the burden of proof in criminal and civil cases has been held to preclude application of the doctrine of *res judicata* in the civil action.

In United States v. Gramer, 191 F.2d 741, 743, 27 A.L.R.2d 1132 (9th Cir., 1951), it was held that acquittal on a criminal charge of introducing misbranded drugs in interstate commerce was not a bar under the doctrine of *res judicata* to a subsequent civil proceeding by the government for seizure and condemnation of subsequent shipments of the same kind of drug preparations.

■ So here, even though many of the same issues of fact and law may have been involved, the unsuccessful attempt to impose criminal penalties upon plaintiffs Jones for the specific violations charged in the Municipal Court prosecutions, does not require that this Court grant the broad declaratory relief sought in the cases at bar, nor does it deprive this Court of its right to determine whether or not its judicial discretion should be exercised to grant the equally broad equitable relief asked by the plaintiffs herein.

This memorandum shall be treated as the court's findings of fact and conclusions of law. The two consolidated cases having been enlarged into class actions, the court's determination applies not only to the named parties in the Ellen Realty Corporation and Jones cases, but to all other persons who may be similarly situated. An order finding for the defendants and granting the motion to dismiss will be issued.